USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/20/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                   :

VERIFICIENT TECHNOLOGIES, INC.,      :

                                   :

                  Petitioner,   :        1:24-cv-9487-GHW

                                 :

          -v-            :        MEMORANDUM
                                 :        OPINION & ORDER

APRATIM DUTTA,             :

                                 :

                Respondent. :

                                 :

------------------------------------------------------------------ X

GREGORY H. WOODS, District Judge:

Petitioner Verificient Technologies, Inc. ("Verificient" or the "Company") filed this petition to confirm an arbitration award against Apratim Dutta, Verificient's former Chief Executive Officer. Verificient asserted that the Court had diversity jurisdiction over the action because it was a Delaware corporation with its principal place of business in New York.  Mr. Dutta rejected that assertion, arguing that Verificient's principal place of business was actually in New Jersey, where he resided.

Verificient conceded that the Manhattan address that it claimed as its headquarters was just a "virtual office" provided by a contractor.  Verificient used the address as a mail drop.  The only time that its officers spent in that office was when they travelled to New York for quarterly meetings of the company's "control group."  But Verificient argued that New York was still its principal place of business because the executives only made what they described as "nerve center" decisions during those meetings.

The Court held an evidentiary hearing to determine whether Verificient had established that its principal place of business was in New York.  Having done so, the Court concludes that Verificient's principal place of business is located in New Jersey, where the officers of the company work 1,738 hours a year and from which its officers direct the operations of the Company—not in

the office in New York State to which they travel for quarterly meetings that last no more than 12 hours every year. Because all of the parties to this action are citizens of New Jersey, the Court does not have subject matter jurisdiction over this action. As a result, the parties' cross-motions to vacate and confirm the award are DENIED and the action is DISMISSED.

## I. PROCEDURAL HISTORY

### A. The Arbitration[1]

Respondent Apratim Dutta was Chief Executive Officer of Petitioner Verificient Technologies, Inc. from its founding in 2013 until he was terminated in 2018. After Mr. Dutta was terminated, Verificient began an arbitration proceeding against him. In it, Verificient claimed that Mr. Dutta had violated his fiduciary duties to the Company. Dkt. No. 1 ¶ 9.

The procedural history of the ensuing arbitration was described by the arbitrator as "exceedingly tortuous." Dkt. No. 11-1 at 6. Eventually, on December 16, 2023, the arbitrator issued a final award (the "Final Award") in Petitioner's favor totaling $483,681.98, which included all of JAMS's fees, partial attorneys' fees, and all "compensation paid to Respondent during the period of disloyalty." *Id.* at 3. Petitioner was also awarded the ability to seek payment of the judgment by levy on shares of Petitioner owned by Respondent. *Id.*

### B. Procedural History

On December 12, 2024, Petitioner filed a petition in this Court to confirm the Final Award. Dkt. No. 1.[2] In its petition, the Company asserted that the diversity of the parties provided the basis

---

[1] The facts that follow are derived from the parties' submissions in support of their respective petitions to confirm and vacate the arbitral award that is at the heart of this dispute. These facts are undisputed but are provided here merely to provide context for the reader.

[2] Interestingly, Petitioner also filed a parallel action to confirm the arbitral award in a New York State court at around the same time. In a July 2025 filing with this Court, Petitioner's counsel explained its decision to file a parallel proceeding in a New York State court and the status of the New York action as follows: "Because a likelihood existed that Respondent might attempt to defeat complete diversity by falsely claiming that he has changed his residence to New York. To preserve its rights Verificient also filed an arbitration confirmation petition in the New York Supreme Court for the County of New York but did not seek to litigate the merits of that Petition. After Respondent's appearance in this action, Petitioner decided to abandon the New York Supreme Court action. Petitioner planned to file a Notice of

for the Court's subject matter jurisdiction. *Id.* ¶ 4 ("Petition[er] Verificient and Respondent Dutta are citizens of different States and the matter in controversy (confirmation of the arbitration award) exceeds $75,000."). On December 13, 2024, the Court directed that Petitioner file the evidentiary record that supported its petition. Dkt. No. 7. Petitioner did so on January 10, 2025. Dkt. No. 13.

Among the materials that Petitioner submitted in support of the petition was an affidavit by the Company's Chief Executive Officer, Rajnish Kumar. Dkt. No. 13-1. That declaration contained a blanket affirmation regarding the location of the Company's principal place of business: "I state as a matter of fact, that: (1) Petitioner Verificient's principal place of business is in the Southern District of New York; and (2) Petitioner Verificient does not have any other principal place of business in any State or elsewhere within the territory of the United States." *Id.* ¶ 5.

On February 3, 2025, the Court authorized alternative service of the petition and supporting materials on Mr. Dutta. Dkt. No. 17. And on April 15, 2025—just one day after Petitioner filed an application for the issuance of a certificate of default against him—Mr. Dutta appeared, asking for an extension of his deadline to respond to the petition. Dkt. No. 24. Mr. Dutta later filed a countermotion to vacate the arbitral award, as well as a response to Petitioner's submissions in support of the petition. *See* Dkt. Nos. 44-47; 53–56.

Most significantly for purposes of this opinion, in his motion, Mr. Dutta argued that the Court did not have subject matter jurisdiction because Verificient's principal place of business was located in New Jersey, where Mr. Dutta lived. Mr. Dutta wrote:

> Petitioner, a Delaware corporation, conducts no business in New York, using a Regus virtual office at 1250 Broadway solely for mail, while its CEO operates from New Jersey and operations are managed from Pune, India. Under *Hertz Corp. v. Friend,* 559 U.S. 77

---

Discontinuance. But before Petitioner could file its Notice of Discontinuance, and without any prior notice to, or discussion with, Petitioner—even though Respondent had been in touch with Petitioner's counsel in this action—Respondent filed a Motion to Dismiss seeking dismissal of the New York Supreme Court Petition. Petitioner filed its Notice of Discontinuance, the clerk of the New York State Court marked the action 'disposed' and we are currently awaiting the New York Supreme Court's Order discontinuing that action." Dkt. No. 74 at 21.

3

(2010), a corporation's principal place of business is its 'nerve center,' which is not in New York.

Dkt. No. 53 at 4.

Verificient filed its response to Mr. Dutta's submissions on August 14, 2025. *See* Dkt. Nos. 82–85. Confronted with Mr. Dutta's argument that the Court lacked diversity jurisdiction, Verificient developed and advanced a theory how the Court might find that its principal place of business was in New York, rather than New Jersey. Verificient acknowledged that all of the day-to-day work of the Company's executive officers happened in New Jersey. But the Company took the position that only the location at which "nerve-center decision-making" occurred mattered to determine where the Company's principal place of business was located. It rolled out that theory in Mr. Kumar's second declaration, in which he wrote the following:

> Accordingly, since August 2018 Respondent Dutta has had no personal knowledge of any of the corporate affairs of Verificient and thus he has no personal knowledge of where and how the "nerve center" decision-making of Verificient was taking place as of December 2024 (at the time Verificient filed the Petition with this Court), and where and how Verificient has continued to make "nerve-center" decision-making from December 2024 to the present. By 'nerve center'[] decision-making, I mean the actual center of direction, control, and coordination of Verificient, and *not* the day-to-day execution and operational tasks associated with carrying out such direction, control and coordination decisions. . . .

> Verificient's executive leadership meets in person at the Verificient headquarters at 1250 Broadway, 36th Floor, New York, NY 10001 (hereinafter the "Verificient Headquarters"), as frequently as is necessary, to make and take the nerve-center decisions and actions necessary to guide Verificient's business, including to: (a) evaluate business progress; (b) set strategic direction; (c) make high-level decisions related to product development; (d) conduct financial planning; (e) conduct legal oversight; and (e) make executive decisions about market strategy. (During the period from October 2024 through present, "as frequently as necessary" has meant about once every 90 days.) These meetings are typically two to three hours long, and have similar agendas: review the finance, sales, and marketing strategy; review of product roadmap; decide on any change in strategy; decide on any hiring at team lead or higher level; approve budgets; review and approve legal strategies; and review and approve any other important business decisions. The first half of each meeting consists of reviewing the progress/updates since the last meeting (prior quarter), and the second half consists of

> planning the upcoming quarter.  In sum, the core decisions guiding Verificient's strategy and governance are *centralized* at Verificient's Headquarters through these in-person sessions, while day-to-day execution and operational tasks are distributed across remote and regional teams (including teams from New Jersey, India, and Canada).

Dkt. No. 83 ("Second Kumar Decl.") ¶¶ 3, 5 (emphases added).  The petition and motion to vacate the arbitral award were fully briefed on October 15, 2025.

After reviewing all of the parties' submissions, the Court scheduled an evidentiary hearing to determine whether the Court had subject matter jurisdiction over this action.  Dkt. No. 121.  In its order, the Court wrote that the "parties' submissions do not provide sufficient factual basis for the Court to determine whether it has subject matter jurisdiction over the dispute."  *Id.*  The Court noted that it expected to hear evidence from Mr. Kumar and Mr. Dutta, as well as any documentary evidence that the parties wished to present to the Court.  *Id.*  In a subsequent scheduling order, the Court highlighted that it "seeks evidence on the location of Petitioner's principal place of business."  Dkt. No. 122.  The Court reminded the parties that it would "take testimonial and documentary evidence at the hearing . . . [that] need not be limited to the evidence previously submitted in connection with the parties' motions to vacate and confirm."  *Id.*

The evidentiary hearing was conducted on February 4, 2026.  During the hearing, the Court heard testimony from Mr. Kumar and Mr. Dutta.  Both parties also introduced documentary evidence.  The following section of this opinion contains the Court's findings of fact from that hearing regarding the location of Verificient's principal place of business.

## II.     FINDINGS OF FACT[3]

### A.      The Business of Verificient and Its Subsidiaries

Verificient Technologies, Inc. was a corporation organized under Delaware law.  Verificient

---

[3] Except as otherwise noted, the following findings of fact describe the facts on and around the date on which this case was filed in December 2024.

was a technology company.  It provided continuous identity verification to academic and other institutions across the world.  Verificient's customers chiefly used its services to ensure the security of tests that were administered by remote means.

Verificient had only three employees:  Rajnish Kumar, the Company's Chief Executive Officer, Chief Technology Officer, secretary, and treasurer; Rahul Siddharth, the Company's Chief Operating Officer and Chief Marketing Officer; and a gentleman named "Randy," whose role was not described to the Court.  The Company was able to conduct its business as an operating company despite its limited staff because of the work performed by its wholly owned subsidiary, an entity located in India named Verificient Solutions Private Limited ("Verificient India").

Verificient India operated as what Mr. Kumar described as a "captive service center provider" to Verificient.  The services provided by Verificient India to Verificient were documented through an intercompany services agreement.  PX 5.  Pursuant to that agreement, Verificient India provided "software development, product enhancement, maintenance, and operational support services" to Verificient.  In exchange, Verificient paid Verificient India a monthly fee.  Under its contract, Verificient retained ultimate control over "product version, customer commitments, external pricing, budgeting approach, and overall financial decisions related to Parent's business and the Services" provided under the agreement.  Verificient also maintained the right to terminate the services agreement unilaterally.  While Verificient itself had only three employees, Verificient India had over 200—all of them providing support to Verificient by virtue of the service agreement.[4]

Verificient had another subsidiary, a Canadian entity aptly named Verificient Technologies Canada Inc. ("Verificient Canada").  Verificient Canada was responsible for selling the Company's products in Canada.  It had only one employee.

---

[4]  Mr. Dutta, the founder of the Company, explained that he structured the Company's operations to rely heavily on services provided from India to reduce the Company's operating costs.

### B. The Executive Officers of Verificient and Their Work

Mr. Kumar joined Verificient in 2013. From 2013 until 2018, he worked as the Company's Chief Technology Officer. In 2024, at the time that this action was filed, Mr. Kumar was the Company's Chief Executive Officer, Chief Technology Officer, secretary, and treasurer. He was also one of two members of the Company's board of directors.

Mr. Kumar worked from his home in Edison, New Jersey. During a typical working day, he worked for between six to eight hours. He worked approximately 50 weeks each year. So, on average, Mr. Kumar worked approximately 1,750 hours a year.

As a multi-hatted technology executive, Mr. Kumar had a variety of responsibilities. He oversaw Verificient's daily operations. Verificient used a computerized dashboard system to track the Company's workflows. PX 7, 8. The page from that system presented to the Court was labelled "FMS of all our – Systems Dashboard," which Mr. Kumar referred to during his testimony as an "auto pilot" system.[5] The system provided the executives of Verificient, including Mr. Kumar, visibility into the processes that workers engaged in across the business.[6] It gave him visibility into the operations of the Company's work flows in India. Employees who were tasked to resolve issues on the FMS dashboard would escalate issues to Mr. Kumar if they were unable to resolve them on their own. Mr. Kumar resolved such issues from his home in New Jersey.

Mr. Kumar communicated frequently during the work day with employees of Verificient and Verificient India. He spent at least two hours a day communicating with those employees. He communicated with them from his home in New Jersey using the Google Meet and Google Chat platforms. In addition, Mr. Kumar met frequently with Mr. Siddharth, the Company's Chief

---

[5] The Court understands the "FMS" in this name to be an acronym for facilities management software.

[6] Mr. Kumar and his counsel attempted to leverage the name of the system—"autopilot"—to characterize the system as truly placing the Company on "autopilot," in support the narrative that Mr. Kumar did not perform material work to oversee his Company's operations while working in New Jersey. The Court finds, however, that the system facilitated Mr. Kumar's work—it did not obviate the need for him to do such work. Instead, it was designed to elevate material decisions to his attention for resolution.

7

Operating Officer and Chief Marketing Officer. Those meetings took place at least twice a week. Mr. Kumar and Mr. Siddharth conducted those meetings using the Google Meet platform. Mr. Kumar did so from his home in New Jersey; Mr. Siddharth did so from his home in New Jersey and other locations.

A principal portion of Mr. Kumar's work involved interaction with the Company's customers and prospective customers. As the Company's Chief Executive Officer, Mr. Kumar approved each new customer that was onboarded to the Company. Almost all of the Company's customers contracted with the Company using a template form of service agreement. PX 6. That template agreement described the Company as being headquartered at 1250 Broadway, 36th Floor, New York, NY 10001. Mr. Kumar approved almost all of those contracts from his home in New Jersey.[7]

Mr. Kumar spent at least half an hour every day communicating with customers and potential customers. He did so from his home in New Jersey using electronic communication technology. While customers were told that the Company's headquarters was in New York, customers did not communicate with the Company's officers while the officers were in New York.

As would be expected for a Chief Executive Officer, in addition to his sweeping responsibilities to oversee the Company's day-to-day operations, its workforce, and to win and retain customers, Mr. Kumar worked on strategic initiatives. He did strategic thinking about the business and its operations while in his home in New Jersey.[8]

---

[7] Mr. Kumar testified that the Company would only approve the contracts of customers that did not use its template form during the Company's quarterly meetings. Examples of such customers, he described, included governmental entities. The Court does not credit this portion of Mr. Kumar's testimony. On the stand he was unable to identify a specific example of such an agreement that was acted on during a quarterly meeting. Mr. Kumar and Mr. Siddharth spoke at least twice a week. It is implausible that the Company—a relatively small technology company—would delay signing up a customer until Mr. Kumar and Mr. Siddharth could discuss the contract in person during a quarterly meeting in New York.

[8] As described in more depth below, the Court simply does not credit Mr. Kumar's testimony during the evidentiary hearing to the effect that he did no thinking about the strategic direction of his Company except during the 12 hours a year he spent meeting with Mr. Siddharth in New York.

In addition to his overall management role as the Company's Chief Executive Officer, Mr. Kumar worked as the Company's Chief Technology Officer. In that role, he worked on product development and implementation. Mr. Kumar participated in daily 7:00 a.m. "stand up" meetings with the members of the software development team. As the leader of that team, he spent time coaching and mentoring junior employees. He also took on a substantial portion of development work himself. His work extended to decisions that impacted Verificient's flagship product. Mr. Kumar did all of that work in coordination with employees of Verificient India while Mr. Kumar was physically located in New Jersey. He did none of that work in New York.

As the Company's corporate secretary, Mr. Kumar was responsible for maintaining the Company's records. Most of the Company's records were maintained by electronic means. All of the Company's paper records were kept in Mr. Kumar's home in New Jersey. None of the Company's records were stored in New York.

Mr. Kumar testified that he filed for and paid taxes on his income from the Company in New York State. He testified that he did not pay income taxes on that income in New Jersey, notwithstanding the fact that he worked approximately 1,738 of his 1,750 working hours per year in New Jersey and no more than 12 in New York State.

Mr. Siddharth was the Company's Chief Operating Officer and Chief Marketing Officer. Mr. Siddharth worked from his home in New Jersey. He was also the second and only other member of the Company's board of directors. Mr. Siddharth worked an equivalent amount of time as Mr. Kumar—six to eight hours a day across the course of the year. Consistent with his titles, Mr. Siddharth provided executive leadership for the Company's operations and marketing efforts.

Little information was provided to the Court regarding the third employee of the Company—"Randy." He worked from his home in Idaho and was not a member of the Company's executive team.

9

C.    **Verificient's Presence in New York**

When Verificient was founded, the Company subleased a physical office in New York City. After the Company received more funding in 2016, Mr. Dutta—the Company's then-Chief Executive Officer—obtained a lease for another office space in Manhattan. But in 2018, Mr. Dutta terminated the lease because the physical office was not being used: Mr. Dutta was on the road selling the Company's products, and Mr. Kumar was working from his home in New Jersey. From 2018 on, the Company operated entirely by remote means.

Even though the Company had no operations in New York, it was important for Mr. Dutta to be able to represent to his customers that the Company was located in New York. He wanted to give potential customers the perception that the Company operated from a "prestigious" address in Manhattan. So, the Company entered an arrangement with WeWork to provide the Company a "virtual address" that it could hold out to its clients as its headquarters address.

By the time that this action commenced, the Company had replaced WeWork and had entered into a "virtual office" agreement with Regus. PX 9. Under the terms of that agreement, the Company paid Regus $112.50 a month on a month-to-month basis. In exchange, the Company could use the Regus address at 1250 Broadway, 36th Floor, New York, New York as its mailing address. The virtual services agreement with Regus listed Mr. Kumar's home address as the Company's address. Mail sent to the Company at that address was forwarded by FedEx to Mr. Kumar at his home address in New Jersey if it was not collected in person.

The virtual office agreement also allowed the Company to use the virtual office's common spaces—such as its cafeteria and reception area—for free. The Company could pay additional amounts to use private office spaces in the virtual office. But to save money, it did not do so. Instead, any meetings that the Company conducted at the virtual office were conducted in a common space. The office space at 1250 Broadway had no dedicated storage or meeting space for

the Company, and it had no signage for the Company.  The Company did not use the address in New York for any purpose other than as a mail drop and for its quarterly board meetings and "control group" meetings as described below.

The Company filed its state tax returns in New York State.  It did not pay state taxes in New Jersey.

### D.    Quarterly Executive Officer and Board Meetings in New York

The Company held quarterly meetings at the "virtual office" space in Manhattan.[9]  The only participants in those meetings were Mr. Kumar and Mr. Siddharth.  The total amount of time that Mr. Kumar and Mr. Siddharth spent working in Manhattan for each of those series of meetings ranged from two to three hours for each set of meetings.  Thus, the total amount of time that Mr. Kumar and Mr. Siddharth spent in those meetings each year did not exceed 12 hours a year.

Each time that Mr. Kumar and Mr. Siddharth met in New York City, they conducted what Mr. Kumar testified to be two separate meetings:  a "control group" meeting of the Company's executive officers and a board meeting.  Mr. Kumar testified that each of those meetings happened sequentially:  what Mr. Kumar described as a "control group" meeting of the Company's executive officers first, and then, a separate board meeting.  The people who participated in both meetings were the same:  in addition to their positions as executives of the Company, Mr. Kumar and Mr.

---

[9]  In his second affidavit, Mr. Kumar affirmed that these meetings took place "as frequently as necessary" and that "'as frequently as necessary' . . . meant about once every 90 days . . . ."  Second Kumar Decl. ¶ 5.  Mr. Kumar's affirmation is misleading.  As documented in the minutes provided to the Court, each of these meetings was a "Quarterly Meeting."  Mr. Kumar did not testify regarding any occasion on which the executives travelled to New York City to engage in a conversation other than for one of these quarterly meetings.  It is improbable that they did so, given that Mr. Kumar and Mr. Siddharth met at least twice weekly using Google Meet and communicated more frequently.  Mr. Kumar's statement that the meetings in New York occurred "as frequently as necessary" is misleading because it suggests that the officers met in New York at times other than for a quarterly meeting if an urgent matter required that they meet in person.  That connotation is not supported by the documentary evidence, which proves that these were "quarterly" meetings.  They were not, as Mr. Kumar's declaration suggests, meetings about significant business matters that just happened to occur about every 90 days.  While the Court believes that the language used in Mr. Kumar's declaration is calculated misdirection, on this record the Court does not find this statement in Mr. Kumar's declaration to be false:  it may be that what made these meetings "necessary" approximately every 90 days was a requirement in the Company's constituent documents.

Siddharth were also the only members of the Company's board of directors.  Mr. Kumar testified that the agenda for the "control group" meeting and the meeting of the board of directors was the same and that there were no topics that the board of directors discussed that were not discussed as part of the executive officer meeting.[10]

Each of the Company's quarterly "control group" meetings followed the same agenda.  The structure of each meeting is reflected in the headings used in the pre-printed forms that the Company used to document each meeting.  The heading for each described the meeting as an "Executive Quarterly Meeting."  Each document contained a heading for the "Agenda" and then listed separate categories under the heading "Minutes of the meeting."  Those topics are "Strategic review," "Financial oversight," "Operations," "Legal/Compliance/Governance."  Under each of those headings were separate sections for "Review-notes from the past quarter" and "Decisions for the next quarter."  Each set of minutes also contained pre-printed sections for "Other Topics" and "Action Items for Next Quarter."

The overall purpose of each of the Company's quarterly "control group" meetings was the same.  Mr. Kumar and Mr. Siddharth reviewed the Company's prior quarter's budget, operations and results.  They conducted a strategic review of the Company's operations during the prior quarter and made decisions about strategic initiatives for the next quarter.  They reviewed and approved the Company's budget and operations and considered whether modifications should be made to them.  And they reviewed the company's legal compliance and governance.  When Mr. Kumar and Mr.

---

[10]  For purposes of this opinion, the Court accepts Mr. Kumar's testimony that the Company held two separate quarterly meetings at the same time in the same place with the same people and the same agenda to discuss the same topics—an "executive officer" meeting, and then a separate "board meeting."  The proof did not establish otherwise by a preponderance of the evidence.  However, neither did the evidence disprove the possibility that the Company held a singular board meeting, but labelled the minutes of those meetings as "Quarterly Executive Meetings," rather than minutes of the board.  After all, Mr. Kumar and Mr. Siddharth were the only executives and board members of the Company.  Mr. Kumar testified that the Company maintained separate minutes of its board meetings in addition to the minutes of the "Quarterly Executive Meeting" presented to the Court.  However, separate board meeting minutes were never presented to the Court.

Siddarth identified high-level issues for which follow-up was required, Mr. Kumar and Mr. Siddharth would assign responsibility for that work.

This general pattern was illustrated in the four sets of "Executive Quarterly Meeting" minutes from 2024 that were presented to the Court. Those meetings took place on April 8, 2024, July 11, 2024, October 8, 2024 and January 7, 2025. All of those meetings took place in the common areas of the Regus virtual office space at 1250 Broadway in Manhattan. Both Mr. Kumar and Mr. Siddharth attended the meetings in person.

The April 9, 2024 meeting minutes illustrated the level of detail at which Mr. Kumar and Mr. Siddarth discussed the Company's businesses during the "control group" meetings. Among the strategic decisions for the following quarter, Mr. Kumar and Mr. Siddarth discussed the possibility of obtaining OpenAI access for some of the Company's business. They also discussed the prospect of hiring a U.S.-based sales representative. Mr. Kumar testified that he and Mr. Siddharth had discussed both topics before the "control group" meeting—the need for a sales representative came up in the course of his conversations with Mr. Siddharth regarding customer care, and the issue of artificial intelligence on the business was one that Mr. Kumar considered prior to the meeting. The minutes reflected that the Company made a final decision to move forward with those initiatives. In the section of those minutes relating to decisions for the following quarter under the heading "Operations," the minutes contain a single entry "Raj to explore solution to reduce data . . . ." Under the heading "Action Items and Assignments" for the following quarter, there are just four entries, three of which were tasks for Mr. Kumar: "Raj to explore and implement solution to reduce data . . . ," "Raj to look into . . . AI to . . . cloud cost," "Raj to work with Rahul to hire account exec . . . ."

Mr. Kumar and Mr. Siddharth did not communicate with any other employees of the Company or its contractors during their quarterly meetings in Manhattan. Nor did they

13

communicate with customers.

###    E.    Mr. Kumar's Testimony Was Not Fully Credible

The Court does not credit many of Mr. Kumar's statements during the evidentiary hearing and in his second declaration. All of the statements that the Court discredits were in service of a distorted narrative designed to support an argument that the Court should find that the Company's principal place of business was located in New York notwithstanding the fact that its executives worked full time from New Jersey and only worked in New York for at most 12 hours a year. The narrative that Mr. Kumar asked the Court to accept was that he, the Company's Chief Executive Officer, Chief Technology Officer, secretary and treasurer, made no material decisions regarding the Company's strategy and operations at any time during the year except during the 12 hours of the Company's quarterly meetings in New York City. Mr. Kumar was operating under the misguided understanding that if he persuaded the Court that all "big" decisions were only made in New York, then the Court would find that the Company's principal place of business was located in New York despite the fact that its officers worked from New Jersey for all but 12 hours a year.

To support this narrative, Mr. Kumar provided testimony to the Court that the Court does not credit as true.[11] For example, in response to questioning by the Court, Mr. Kumar testified that he did not make any material decision as the Company's Chief Executive Officer except during the 12 hours of the Company's quarterly meetings in New York.[12] He testified that any decisions with a

---

[11] During the evidentiary hearing, Mr. Kumar testified that he had not discussed his testimony with his counsel, but the Court does not credit that testimony. The Court does not believe that Mr. Kumar used the term or concept of "nerve-center decision-making" on his own initiative, without the guidance of his counsel. Nor does the Court believe that the Chief Executive Officer of a technology company would take the position that he only worked as Chief Executive Officer for 12 hours a year without substantial coaching.

[12] Such as the following testimony: "THE COURT: Do you make any decisions at times other than during the executive meetings? Yes or no. MR. KUMAR: Not as CEO your Honor. THE COURT: You don't make decisions? MR. KUMAR: Not as CEO that will materially impact the company that I should be -- to do the decisions I leave it to the control group meeting, your Honor." "THE COURT: Just to follow up on that. With respect to decisions regarding operation of your business in the ordinary course, including decisions under contracts, you did those in the following quarter, is that what you're saying? MR. KUMAR: So our -- the way we operate, we have systems in place to maintain the operations on a kind of auto pilot. Where those systems like, they monitor and bring the data and then as a course the day-to-day operations I do review those metrics and anything that needs strategic decision or other site, I

material impact on the Company's operations were only made during those meetings. Mr. Kumar's testimony that he and Mr. Siddharth did not make material decisions regarding the business of the Company outside of the 12 hours of meetings in New York was not credible.

Mr. Kumar had ample motive to provide inaccurate testimony regarding these matters. Mr. Kumar knew that if the Court found that the Company's principal place of business was not located in New York, Verificient could not continue its action to confirm the arbitral award against Mr. Dutta in this Court. That was meaningful to Mr. Kumar: the amount at issue was substantial, and the arbitral award could permit the Company to seize Mr. Dutta's equity in the Company if Mr. Dutta did not satisfy the monetary judgment. There was also no love lost between Mr. Dutta and Mr. Kumar; confirmation of the arbitral award against Mr. Dutta would be a win for Mr. Kumar in their on-going feud. Finally, Mr. Kumar was aware that he might be found to have improperly filed personal taxes in New York if the principal place of business of the Company was in New Jersey, rather than New York. Avoiding such potential adverse personal tax consequences also motivated Mr. Kumar to advance this distorted narrative.

Mr. Kumar's statements to the effect that he only made material decisions as an officer of the Company, particularly as the Company's Chief Executive Officer, during the 12 hours a year in which he was physically present in New York is inherently implausible. So too was Mr. Kumar's testimony to the effect that he only thought about strategic issues for the Company during the 12 hours of meetings in New York City. The active work life of a company's Chief Executive Officer was much more accurately reflected in the testimony of Mr. Dutta, who described the constant pressures he felt while inhabiting that role at Verificient. Mr. Kumar's desire to be viewed as a Chief Executive Officer who worked less than 0.7% of his yearly hours making strategic decisions as the Company's Chief Executive Officer can only be explained by a desire to mislead the Court.

---

bring that to the control group meeting in New York."

Similarly, Mr. Kumar's testimony to the effect that the Company operated on autopilot between quarterly control group meetings cannot be credited. Mr. Kumar's statement in his affirmation, and later testimony, that during the period between quarterly control group meetings, he and other officers at the Company only executed decisions made at the control group meetings is not worthy of credence.

There are many reasons why the Court does not credit Mr. Kumar's statements in this regard. First, Mr. Kumar and Mr. Siddharth met at least twice a week and communicated regularly between their weekly meetings. The Court does not believe that in a thinly staffed Company, they would not discuss issues material to the Company at any time during the year except while physically present together in New York. In response to the Court's questions, Mr. Kumar conceded that he and Mr. Siddharth did communicate about issues of significance to the Company between quarterly meetings.

Second, Mr. Kumar testified about his role in managing the daily operations of the Company. He testified that material issues—ones that could not be handled by his subordinates— were escalated to him and that he resolved them while working in New Jersey. Similarly, he testified about a major cyber incident in which the Company was involved, which he conceded was a material event. Mr. Kumar managed the Company's response to that incident. He did that from his home in New Jersey; he did not wait to respond until the next quarterly meeting. As the Company's CEO, Mr. Kumar made decisions regarding material matters related to the Company for more than 12 hours a year. Any testimony suggesting that he did not is not credible.

Third, Mr. Kumar's testimony to the effect that strategic decisions were developed and made exclusively during the control group meetings in New York was belied by his own testimony. Again under examination by the Court, Mr. Kumar acknowledged that ideas discussed during the "control group" meetings were considered and developed by him—and sometimes discussed with Mr.

16

Siddharth—before the control group meeting.  That, of course, makes sense:  strategic initiatives do not spring Athena-like, fully formed from an executive's head while emerging from the Lincoln Tunnel.  They are developed in advance for discussion.  Mr. Kumar grudgingly acknowledged that this was the case for him only when questioned.

Fourth, the minutes provided to the Court do not support Mr. Kumar's affirmation that the only things that he and the other people at the Company did during the quarter following a "control group meeting" was to "carry out" decisions made there.  Take, for instance, the April 2024 minutes of the Company's control group meeting.  The only action item designated for the next quarter under the heading "Operations" was "Raj to explore solution to reduce data . . . ."  The Court does not believe that the only thing that the Company did operationally for the following quarter was for "Raj to explore solution to reduce data . . . ."  As Mr. Kumar testified, the Company was an operating company.  It did many other things in its operations.  Nor does the Court believe that the only general matters that Mr. Kumar pursued during the following quarter were the three action items specifically assigned to him.  Simply put, Mr. Kumar's testimony to the effect that the entire operations of the Company for a quarter consisted of the implementation of decisions made at each control group meeting was not supported by the minutes.  The minutes do not have sufficient guidance regarding the following quarter's operations for that assertion to be true.

This factual assertion is also belied by the duration and agenda for each meeting.  The meetings lasted three hours at most.  A substantial part of that time was dedicated to a review of the prior quarter's operations.  The Court does not believe that Mr. Kumar and Mr. Siddharth could, as Mr. Kumar would have the Court believe, choreograph all of the operations of the Company for the following three months in the limited period of time that followed their review of the prior quarter's performance.

Fifth, Mr. Kumar's account of events shifted over time.  In his first declaration, he presented

17

no factual basis to support his conclusory assertion that the Company's principal place of business was in New York.  He only developed his "nerve center decision-making" theory when confronted by Mr. Dutta's motion to dismiss the petition for lack of subject matter jurisdiction.  Mr. Kumar's use of language to describe his Company's operations shifted even after he delivered his second declaration.  As flagged above, in that declaration, Mr. Kumar did not affirm that the decisions were "made" in New York.  Instead, he affirmed that they were "centralized" in New York.  Confronted with this choice of words during the evidentiary hearing, Mr. Kumar testified that by saying "centralized" he meant to say "made."  But the Court finds that Mr. Kumar's first choice of words more accurately reflects reality:  He and Mr. Siddharth made decisions from their home offices in New Jersey and "centralized" them in New York in a meeting that recapped prior discussions and decisions.

Sixth, Mr. Kumar's failure to disclose the fact that the Company held meetings of its board of directors at the same time as what he tactically described as the Company's "control group" or "executive officers" meeting leads the Court to conclude that his account was not candid.  As Verificient's counsel were likely aware, in *Hertz Corp. v. Friend*, the Supreme Court held that a Company's principal place of business was "not simply an office where the corporation holds its board meetings . . . ."  559 U.S. 77, 93 (2010).  As a result, the Company and its counsel had substantial motivation to characterize the quarterly meetings as anything other than a board meeting.  Mr. Kumar's affirmations omitted the material fact that the Company's quarterly meetings were, at the very least, coupled with board meetings.  This fact emerged during the evidentiary hearing only as the result of questioning by the Court.  Mr. Kumar's decision to obscure this important detail from the Court, like his careful description of the quarterly meetings as "control group" meetings, leads the Court to conclude that his presentation to the Court was not candid.  His lack of candor on this point casts a shadow on other parts of his testimony.

Seventh, the Court scrutinized Mr. Kumar's demeanor during his testimony.  He was not a credible witness when he provided testimony in support of this distorted narrative.  He looked questioningly at his lawyers while delivering such testimony.  He was nervous.  When pressed, he changed his story.  He only grudgingly acknowledged the kind of active decision-making and engagement in his Company's business operations and strategy that a reasonable person would expect a Chief Executive Officer to tout.

Mr. Kumar believed that it was important for him to distinguish between what he termed "nerve center decision-making" and other decision-making in order to preserve his Company's ability to pursue this action in this Court.  He understood that it was important for him to de-emphasize the materiality of his work outside of the control group meetings in New York.  He colored his testimony to fit that narrative.

The Court does not credit Mr. Kumar's testimony in support of that distorted narrative.  The Court finds that Mr. Kumar and Mr. Siddharth regularly made decisions material to the Company in their roles as executives of the Company.  They did so on a day-to-day basis from their homes in New Jersey.  The quarterly "control group" meetings held by Mr. Kumar and Mr. Siddharth were the equivalent of board meetings—indeed, the formal board meetings, which happened immediately afterwards, simply recapped the control group meetings.  During those meetings, they reviewed the prior quarter's operations and results, and considered upcoming projects, but Mr. Kumar and Mr. Siddharth did not make all material decisions regarding the operations and strategy of the business during those meetings.

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court must dismiss a claim when it "lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted).  The Federal Arbitration Act "does

19

not independently confer subject matter jurisdiction on the federal courts." *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (internal quotations omitted). Instead, "there must be an independent basis of jurisdiction before a district court may entertain petitions to confirm or vacate an award under the FAA." *Id.* (internal quotations omitted).

In this case, Petitioner relies on the Court's diversity jurisdiction. 28 U.S.C. § 1332 confers jurisdiction on federal district courts to hear causes of action when the amount in controversy exceeds $75,000 and there is complete diversity of citizenship. *Id.* "The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it." *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010); *see also Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) ("It is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction, and it must prove jurisdiction by a preponderance of evidence." (internal quotations omitted)). "When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof." *Hertz*, 559 U.S. at 96–97. A "party's citizenship is analyzed at the time the suit is filed . . . ." *D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*, 886 F.3d 216, 226 n.8 (2d Cir. 2018).

"A corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . . ." 28 U.S.C. § 1332(c)(1). It is easy to determine where Petitioner was incorporated—Delaware. This case requires that the Court determine the Company's principal place of business.

In *Hertz Corp. v. Friend*, the Supreme Court adopted the "nerve center" test first propounded by Judge Weinfeld of the Southern District of New York "[i]n an effort to find a single, more uniform interpretation of the statutory phrase ['principal place of business']." *Hertz*, 559 U.S. at 92. The Court announced that a corporation's "principal place of business" is "best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities."

*Id.* at 92–93. "It is the place that Courts of Appeals have called the corporation's 'nerve center.'" *Id.* at 93. "And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id.* "A corporation's 'nerve center,' usually its main headquarters, is a single place." *Id.* "The public often (though not always) considers it the corporation's main place of business." *Id.*

In *Hertz*, the Supreme Court quoted at length from the opinion in which Judge Weinfeld developed the nerve center test:

> Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the *nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale*, in the furtherance of the corporate objective. The test applied by our Court of Appeals, is that place where the corporation has an office from which its business was directed and controlled—the place where all of its business was under the supreme direction and control of its officers.

*Id.* at 89–90 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862, 865 (S.D.N.Y. 1959) (Weinfeld, J.)) (emphasis added). The Supreme Court also looked to the Seventh Circuit's application of the test. *Id.* at 92 (citing *Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986) (Posner, J.)). Applying its version of the test, the Seventh Circuit panel observed that to locate the "nerve center" of a corporation, "[courts] look for the corporation's brain, and ordinarily find it where the corporation has its headquarters." *Wisconsin Knife Works*, 781 F.2d at 1282.

The Supreme Court recognized that under the nerve center test, "there will be hard cases." *Hertz*, 559 U.S. at 95. "For example, in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations,

perhaps communicating over the Internet." *Id.* at 95–96. Nonetheless, the nerve center test "points

courts in a single direction, toward the center of overall direction, control, and coordination." *Id.* at

96. The opinion in *Hertz* contained a comparison to the address that a company that was visible to

the public in New Jersey while its officers operated from New York, which, in the inverse, is directly

relevant to this case:

> We also recognize that the use of a "nerve center" test may in some
> cases produce results that seem to cut against the basic rationale for
> 28 U.S.C. § 1332. . . . For example, if the bulk of a company's
> business activities visible to the public take place in New Jersey, while
> its top officers direct those activities just across the river in New
> York, the "principal place of business" is New York.

*Id.* at 96.

Finally, the Supreme Court expressly rejected "suggestions such as, for example, the one

made by petitioner that the mere filing of a form like the Securities and Exchange Commission's

Form 10-K listing a corporation's 'principal executive offices' would, without more, be sufficient

proof to establish a corporation's 'nerve center.'" *Id.* at 97[13]

> Such possibilities would readily permit jurisdictional manipulation,
> thereby subverting a major reason for the insertion of the 'principal
> place of business' language in the diversity statute. *Indeed, if the record
> reveals attempts at manipulation—for example, that the alleged 'nerve center' is
> nothing more than a mail drop box, a bare office with a computer, or the location
> of an annual executive retreat—the courts should instead take as the 'nerve
> center' the place of actual direction, control, and coordination, in the absence of
> such manipulation.*

*Id.* (emphasis added).

As a *pro se* litigant, Mr. Dutta's submissions are to be "construed liberally and interpreted 'to

raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474

---

[13] The Court also noted with approval an opinion by Seventh Circuit concluding that a rule governing local tax matters did not determine the location of a company's principal place of business. *Hertz*, 559 U.S. at 97 ("Cf. *Dimmitt & Owens Financial, Inc. v. United States*, 787 F.2d 1186, 1190–1192 (C.A.7 1986) (distinguishing 'principal executive office' in the tax lien context, see 26 U.S.C. § 6323(f)(2), from 'principal place of business' under 28 U.S.C. § 1332(c)).").

(2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

## IV.    DISCUSSION

The Court does not have subject matter jurisdiction over the parties' dispute.  The parties do not dispute that the amount in controversy requirement has been met, that Respondent is a New Jersey citizen, and that Verificient was incorporated in Delaware.  They agree that Verificient's principal place of business is located somewhere in the United States.  The only issue in dispute is whether Verificient's principal place of business is in New Jersey, where each of its senior executives work for 1,738 hours a year, or at the "virtual office" in New York, to which they travel quarterly for meetings that last no more than 12 hours a year.  The answer is New Jersey.

Verificient's corporate "brain" is located in New Jersey.  It is in New Jersey that its only two senior executives perform nearly all of their work annually.  Mr. Kumar and Mr. Siddharth communicate with the Company's contractors from New Jersey.  They communicate with the Company's customers from New Jersey.  They communicate with each other multiple times a week from New Jersey.  Company employees, contractors, and customers do not communicate with the Company's officers while the officers are in New York.

Verificient has not proven that its principal place of business is in New York.  To the contrary, all of the facts that the Company points to in support of its argument represent the kinds of "attempts at manipulation" of which the Supreme Court warned in *Hertz*—namely, "that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer . . . ." *Hertz*, 559 U.S. at 97.  Verificient does not have a physical presence in New York other than its "virtual office" arrangement with Regus.  It uses the address in New York as "a mail drop box," to which mail is sent, and is in turn redirected to Mr. Kumar's home in New Jersey.  The virtual office demonstrates even less presence than "a bare office with a computer," because the virtual office has no dedicated space or signage for Verificient—when Verificient's officers meet in New York, they

23

use only the office's common spaces.

The quarterly meetings held by Verificient's officers and directors in New York do not establish New York as the Company's nerve center. In *Hertz*, the Supreme Court held that a corporation's principal place of business is "not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Hertz*, 559 U.S. at 93. Similarly, the Court noted that a finding that the "alleged 'nerve center' is nothing more than . . . the location of an annual executive retreat" would not permit a court to conclude that the location was the corporation's principal place of business. *Id.* at 97. These are apt descriptions of Verificient's use of its virtual New York office.

The virtual office was the office where the Company held its board meetings. Mr. Kumar and Mr. Siddharth—the Company's only officers and board members—travelled to New York for the sole purpose of conducting these meetings. They did no other work while there. That the Company's meetings in New York occurred quarterly, rather than annually does not change the analysis—New York was where the officers held a periodic off-site meeting, not where the officers actually controlled the Company's business.

The fact that the Company holds itself out to its customers and others as being headquartered in New York does not make New York its principal place of business. During the evidentiary hearing, and in its briefing, Verificient made much of the fact that the address that the Company represents as its headquarters to its customers and others is the Manhattan address of its virtual office. However, in *Hertz*, the Supreme Court explained that "if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the 'principal place of business' is New York." *Id.* at 96. Swap New York for New Jersey and this hypothetical describes this case: even if the bulk of the Company's business activities visible to the public were understood by customers and others to take

24

place in New York, because its top officers directed the Company's activities just across the river in New Jersey, the principal place of business of the Company is New Jersey. The fact that Verificient promoted the idea that its headquarters was located in New York in order to make the Company appear to be more prestigious does not make New York its principal place of business.

Similarly, the fact that Verificient filed its state taxes in New York, rather than in New Jersey is not dispositive. That the Company chose to file its return in New York rather than New Jersey sheds little light on the place where the Company was directed and controlled.[14]

The authorities that Verificient cites for its contention that the Company's quarterly meetings are sufficient to render New York its principal place of business are readily distinguishable. In its briefing, Petitioner cites *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337 (3d Cir. 2013). In *Johnson*, the Third Circuit distinguished the "sprawling operating company" in *Hertz* with the defendant, which was a holding company. *Id.* at 354. The court there held that the holding company's primary activity was simply managing its assets, and therefore the "relatively short, quarterly board meetings may well be all that is required to direct and control the company's limited work." *Id.* In this case, by contrast, Verificient is not a holding company. Mr. Kumar confirmed that it is an operating company. Although most of its employees work for its captive subsidiary, Verificient India, those employees work as contracted service providers to Verificient.

During the evidentiary hearing, Petitioner's counsel cited to *Eigo v. SS&C Technologies, Inc.* No. 24-CV-7028 (NG) (LGD), 2025 WL 2078716 (E.D.N.Y. July 24, 2025), which is also readily distinguishable. In *Eigo*, the party seeking to assert subject matter jurisdiction provided a declaration from a corporate employee that "major corporate functions including [the company's] centralized record-keeping, accounting, finance, and human resources are managed and/or directed in Windsor,

---

[14] Mr. Dutta testified credibly that he was not aware of any tax benefit for the Company to file its state tax returns in New York rather than New Jersey. The Court also credited Mr. Kumar's testimony that he was not aware of any tax benefits for the Company from its decision to file state corporate income taxes in New York as opposed to New Jersey.

Connecticut." *Id.* at *5. But as the Court has found, none of those functions in this case were "directed" by the Company from New York. Mr. Kumar maintained physical copies of the Company's records in New Jersey, mentored and supervised employees in New Jersey, pursued new customers from New Jersey, and strove to keep existing customers happy from New Jersey.[15]

## V.    CONCLUSION

For the reasons stated above, the parties' cross motions to vacate and confirm the Final Award are DENIED, and this action is DISMISSED without prejudice for lack of subject matter jurisdiction.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

---

[15]    Verificient's argument that the Court could find that the Company's principal place of business was located in New York was predicated on the proposition that high-level officers who work regularly in one place can defer "high-level decision-making" to periodic meetings in another place to which they travel for that purpose, making the latter the corporation's principal place of business. But Petitioner cited to no cases that supported the contention. The Court has independently canvassed the applicable law to evaluate Petitioner's argument and has found no cases that support it.

There is one district court opinion that construed the nerve center test to "focus[] on where a corporation's 'high-level' decisions are made, not where day-to-day activities are managed." *St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*, 87 F. Supp. 3d 603, 605 (S.D.N.Y. 2015). At first glance, this language might be understood to support Petitioner's argument. However, *St. Paul Fire*'s reference to "high-level decisions" does not imply that a corporation can establish its principal place of business by having a periodic off-site meeting of its senior executives at which "high-level decisions" are made.

It is clear that the court in *St. Paul* did not announce such a rule. The only source that *St. Paul* cited for its description of the test was the Fourth Circuit's decision in *Central West Virginia Energy Company, Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 106 (4th Cir. 2011). In that case, the court mentioned "high-level decisions" in reference to the location where a corporation's high-level officers regularly worked, as compared with the location where the corporation's day-to-day business operations took place. *Id. Central West Virginia* evaluated a situation in which the corporation's high-level officers worked in one place while the corporation's day-to-day operations were conducted in another. It involved nothing more than a straightforward application of the principal in *Hertz* that "courts should instead take as the 'nerve center' the place of actual direction, control, and coordination . . . ." 559 U.S. at 97.

*St. Paul* does not stand for the proposition that high-level officers who work regularly in one place can defer "high-level" decisions to another place to which they travel for that purpose, making the latter the corporation's principal place of business. Such a rule is not supported by the decision in *Central West Virgina*, the only case that *St. Paul* cites in support of its statement of the law. It is not supported by the district court's decision in *St. Paul*, which also turned on a straight-forward application of the rule established in *Hertz*. Adopting a rule of the type promoted by Petitioner would invite the type of "jurisdictional manipulation" the *Hertz* Court sought to avoid. *Id.* at 97.

The Clerk of Court is directed to mail a copy of this order to Respondent by first-class and certified mail at his address of record as indicated at Dkt. No. 28.  The Clerk of Court is further directed to terminate all pending motions and to close this case.

SO ORDERED.

Dated:  February 20, 2026
        New York, New York

_____
GREGORY H. WOODS
United States District Judge

27